and today we're here to discuss this major issue, is whether or not the district court erred in applying a cross-reference to armed robbery on a charge of convicted felon in possession of a weapon. This is not something that either the prosecution nor have I ever seen before. Most of the times when we talk about cross-references to a 922, we're talking about cross-references where somebody is arguing that a death that resulted was really in self-defense. That's the majority of the jurisprudence on that. So when I asked for oral argument, I was mindful of two things. First is that everything looks different every single day on a case like this. When you've got a strange client, strange case, and complicating remarks by the judge. The second thing that I thought about is sometimes maybe you shouldn't ask for oral argument, that it's better to have people think that you're an idiot rather than open your mouth and confirm it. So with those principles in mind, let me start off. I think we've got several overlapping questions in here. What we start off with is the judge saying that he cannot believe that if you have two overlapping, temporally overlapping crimes, that you could be not guilty by reason of insanity for one, and yet guilty on the other. The first question, therefore, I think is, is the judge wrong about that as a matter of law? And I think that quite clearly the judge is wrong on that. First off, when you charge a jury, you would tell them that indeed each count is to be evaluated separately. Secondly, you would tell the jury that insanity is relative to the crime charge in the particular times because we all recognize that the concept of insanity is fluctuating. Is it a fact-finding that this court made? You know, that's an interesting question because I don't know whether it is a fact-finding mission on the part of the court. I've never seen something that would possibly be more of a combination of legal and facts than this, as opposed to a purely fact-finding mission. A fact-finding mission on self-defense, for instance, you look at the different things that might have happened, and you say, well, are we going to give the cross-reference or not? That depends as to what a reasonable man might have done in the similar situation. The second you raise the question of insanity, the second you put that word into the case, all of a sudden you're not talking about what a reasonable man would have done. You're not talking about looking at time. You're not talking about something that you can feel, something that you can see, something you can hear, that you can smell. Well, it is something you can evaluate with experts. Excuse me? It's something you can evaluate with experts. In other words, is it not a factual determination that then leads to some legal consequences or determinations? Yes, I do. For that limited sentence that you've just given, yes, I'll agree with that. And don't ask me to explain to further than that because I might not be able to. But we did then have an expert witness who testified in this case. In fact, there was only one expert who testified, and that expert testified on behalf of defense. She testified, Dr. Galland, Sarah Galland of Tulane Medical School, testified that, yes, you could be saying as to one offense had a temporally overlapping offense. Well, I thought what she said was I looked at the robbery, and he was actively psychotic at that point. I didn't look at the possession of the firearm. She expressly stated that the possession of the firearm began before and ended afterwards on that. In the sense of on or about, if an indictment is charging on or about, then you've got to decide, well, what happened on the end? And if all you can get is, yes, the armed robbery, because she was asked to evaluate both, if all you can get from the expert is that, yes, the armed robbery would have been not guilty by reason of insanity, you know that you're going to have a tough time at trial. You know that the answer is going to be it's a different matter for the 922 on that. Because if he had the gun long before, as he told her, and he had the gun long afterwards, then it doesn't really matter too much. He didn't have the gun for very long afterwards, because they apprehended him when they found him, right? I mean, it was basically contemporaneous. You're right. You're right. He had the gun for a long time prior to that. He did not have the gun for a long time after that, because he was apprehended that night and relieved of the gun. Now, was this raised in context of the cross-reference provision for armed robbery, or was this raised really in the context of the request for a downward departure or a variance? It was raised in context of both. It started off really very, very early in the case. When I got onto the case, and the case had been seven months, I think, at that point, or six months with the Federal Public Defenders, and they asked me to take it on as a CJA client, I met a man who had stolen a truck full of human ordeal, waste, whatever you want to call it, a truck that was pumping out port-a-lets, and he said that he did so because God had told him to do so. So I immediately asked for that evaluation by Dr. DeLand, or at least within six weeks. I did it in a completely open motion. I did not seal that motion. In fact, it was the Fifth Circuit, when they granted funding, who then sent it to me back as a sealed, and it's not necessarily a rebuke, but somehow insinuating that I should have filed it as a sealed motion to begin with. I immediately gave copies to both the judge and to the prosecutor, who had it at the time of sentencing, and when the judge did ask, and we get two specific words being used, when the judge just asked, are you going to contend that insanity played a role in the offense, the offense is a 922. There is possibly relevant conduct, but the offense itself is a 922, and no, we weren't raising it as a defense to the 922 possession of a weapon. I used the law, and I don't know if it was you, the counsel, at sentencing, effectively when you were asking for a variance for the defendant, basically conceded that the application of the armed robbery cross-reference was mandated by the guidelines. I mean, you hadn't challenged it. No, I hadn't said that. What I said is it may be, and that's sort of to go along with the judge. I don't think Ms. Jackson had any choice but to write it up that way, and I'm assuming that's who prepared the PSR, the recommendations. I think that I wrote that because, as both the government and I agree, the sentencing guidelines are ill-suited to something of this nature. They're inextricably intertwined, the idea of the departure, the variance, and the cross-reference, because they all have to refer to something for which we are saying that, and the only way to testify. Is your position that if you raise the issue with regard to a downward departure, it's also preserved for a variance request or vice versa? I think that I raised it in terms of there shouldn't be a cross-reference, and I think that also goes both to departure and variance. Now, as we know, the guidelines are continually evolving. The guidelines, for instance, now are going to not have any reference whatsoever to departures. They're only going to have references to variances probably from the end of this year. We know that the acquitted conduct guidelines are changing to resolve circuit splits. This, however, is something that had never been contemplated and never come up in the jurisprudence. So to try to figure out exactly how we're doing it, that's why when the judge said, Are you done with this? I figured, Judge, in your hands, you have Dr. DeLand's report. I had told you beforehand that I was going to try to use Dr. DeLand's report, though ill-advisedly at the time of the plea, I said, for departure or variance, I should have said, or to prevent a cross-reference too. But it was apparent to everybody by the time we got to sentencing, and certainly before the minute sentence was pronounced, that we were talking about departures, variances, cross-references, whatever you may have. It's an effort to get the lower sentence for the client, and we see again in the whole, I guess the whole byword in terms of sentencing amendments at the Sentencing Commission right now is simplification so that we don't have all these, well, you know, you forgot to put the comma here, or you forgot to say and here, but to get to the core of the issue. And the core of the issue is that we were saying that he should not get his sentence enhanced in any fashion for conduct for which he was not morally responsible. And that's the essence of insanity. That's how it differs from other unadjudicated conduct. You might have a crime that the statute of limitations bars being prosecuted. You might have juvenile educations that can go ahead and can be used to enhance somebody's sentence. But when we're talking about somebody who doesn't know the difference between right and wrong with respect to particular conduct, we're talking about somebody who doesn't have that moral responsibility. But what established your position that he didn't know the difference when he apologized to the truck driver, he apologized to the policeman for doing God's will or whatever? I mean, we know he's not normal, but he knew right from wrong because he apologized for taking a truck. He, let's take the second verse, he apologized to the truck driver for having to do what he had to do is ordered by God. When he spoke to the policeman who had arrested him, he said, I've got to apologize. The guy said, you don't have to apologize to me. No. What he had to do was he had to apologize to God for not having finished God's commands. That's a totally different thing. He didn't say, I want to apologize to you, Mr. Policeman. He said, I'm going to have some apologies to make or I've got to apologize. And that's to God because God had told him to keep going until the truck fell off or the wheels fell off the truck. He didn't say he had to apologize. He didn't say, no, you're right. That's not on the tape. That's not valid. You're right. He just said, I have to apologize. He didn't say to the policeman. He didn't say to God. He didn't say to whom. He just said he had to apologize. Your critique of Judge Ash's sentencing, what are you referring to? Of Judge Ash's what? His sentencing where he said, I don't see how I can hold him responsible for one act and not for another. Well, I think that he's totally wrong on the law. Which was the act that he wasn't supposed to, that you think he should have been referring to? If Judge Ash, we wouldn't be here today probably, if Judge Ash had said, I've heard everything that Dr. Galland said. I've carefully considered it and I'm holding it. I don't believe that she has an ounce of support for what she has said. That's not what Judge Ash said. What Judge Ash said is, the law cannot envision you being not guilty by reason of insanity for one event that overlaps, one for which you are guilty. He said, I personally can't accept that and the law can't accept it. Well, the problem is that the law can accept it and the law does accept it. Not necessarily in terms of, you know, we went through this whole thing in the briefs about, are we talking about inconsistent verdicts? I don't think any of us really like the terms inconsistent verdicts because we don't know what the jury based their verdicts on when they're coming back with a general verdict. But I think in the terms of issue preclusion, we find out that you can have, you can have in fact those two different verdicts. So when Judge Ash said, I personally can't accept and the law can't accept it, that means I don't need to go further. And the fact that he is a prosecution point and said, thanks everybody for coming here today, really, really I don't think means anything. That is, that is really sudden politeness. What is, I'm trying to think of what the old saying is, you know, son I, well bless you dear, or something on that. The old sudden saying about bless you dear. Well, it doesn't mean what it sounds like. It means thanks a lot for taking up my time and we're going to move on to this. And that's essentially what Judge Ash was doing. He was saying, thanks very much for what you said, but my core beliefs are that you can't have the situation that Mr. Dostky and that you Dr. Deland are saying exists. And same thing, when I used to teach capital defense voir dire, we used to always tell people, the best you can ever do in voir dire is on something like either the morality of abortion, the morality of giving death penalties to somebody else who has taken life. The best you can ever hope to do is determine a juror's position. You're not going to change them either during that voir dire, you're not going to change them during a trial. In this case, we have Judge Ash telling us what his position is. My position is that that is impossible, and yet I think the law says it is possible. And it's because he said that, because it's such a core position, that we're also arguing that you can't remand it to Judge Ash, because then essentially what you're doing is giving him a road map to say, okay, now I don't believe what Dr. Deland is saying at all, and I'm going to go ahead and increase and I'm going to impose the very same punishment. Because truthfully, every one of us, when given that opportunity in our own lives, we seize upon the opportunity. If somebody gives us an out, we're generally happy to reach out and grab it. That's essentially what I'm saying is to this. But Lord, I see that we're getting down there to the last minute, so I'll reserve the rest of my time for rebuttal and let the prosecution speak to you. Well, I'll just say we don't routinely, and you know you've been around the block a long time.  You know, yeah, you got tread on your tires like the rest of us, but we don't routinely reassign cases. Judges say a whole lot of stuff in the district court. Both of you know that, but that alone doesn't mean that the judge can't follow the law. You know, once told what the law is, body, body, body. So, I mean, I read something that just jumped off this page about, you know, reassigning who was sent down. I see you've made your argument, but I mean, really? You know, judges say a lot of things. Sometimes they say things, you know, they really shouldn't. They're human beings. We say things up here, but it doesn't mean that the judge can't follow what the law is. We say it's X, that that means that's so embedded that it can't follow the law that we're just going to reassign it to somebody else who didn't say it. I'm sure you can't mean that. I do mean it, Judge. I actually do mean it. And at the same time, I will say, yeah, that's another old expression like give him enough rope to hang himself type thing. You love it when judges start talking. That's true because we as human beings say a whole lot of things. So you love it when a judge starts talking and tries to explain himself and maybe ties a rope around his feet or around his neck. And I think in this case, by saying that that's one of his core beliefs, I am asking you to remand to a different judge because I don't think that you can say it sternly enough. And besides which, it depends on which standard you're going to use. And the Fifth Circuit has used different standards as to whether or not they're going to remand it to the same judge. Again, you're right. It's a very, very rarely used remedy. But if you remand it to Judge Ashton, we get back to the same sentence. I can tell you there's not going to be anybody on my side of the courtroom who's going to ever believe that that wasn't predetermined. That might just be our prejudices too. I'll say it the rest of my time. You know, it's like we tell jurors. What the lawyers say is argument. We say what they say is argument. You know, they pound the tables. They say all kinds of stuff. You tell the jury, you listen to the instructions I give you. That's what you follow. As lawyers who represent their clients, they say and say it. You, as a lawyer, say it. Don't hold against me what I've said. I'm an advocate. So surely we're not going to bounce you off the case because you say something that's not. This is not a question, and I'm not asking you to respond. But I'm telling you because I'm in a wheelchair and you look at me right in the eye. And having been there, you know we don't routinely reassign judges off. And I've read a lot of tougher records than this that, you know, we don't just reassign. And I know you're making it seriously, but I'm glad this is not an NOA case. So I got to ask this question. Really? You must be planning to do no more work across the street at EDLA. Anyway, this is totally rhetorical. You don't have to answer it. I'm 70. I don't know how much longer I'm going to be around. I've been around murder cases for 50 years now. I don't know that I want to be around them that much longer. The court loves candor. Time for me to go and be back in rural France with just sheep and cows and nothing else. Thank you. All right. Well, I'm not denigrating the seriousness of the arguments you make on behalf of your client. But I am just making the point. I read that about reassigning the case. It's not a throw-in, but, you know, from my, I'm not speaking for my colleagues here. But anyway, I just said really. But anyway, you made your argument. You have rebuttal. Let's hear from counsel opposite. I know you're not falling on your sword on that one. But anyway, the record has got what you say. Thank you, Governor. All right. All right, Mr. Gordon. You're another one that got tread on the tires. You've been around, you know. I'm glad we have two veterans in here. Lots of stuff said. And they send the heavyweights to argue guidelines. You know, we say, look out, right? Just trying to keep the tires on the road at this point. I got you. All right. Proceed. You may have pleased the court. Your Honor, there are two reasons the court should affirm the sentence here. One, I'll actually finish up later, but it's basically the reasons given for the sentence and the facts of the case, especially as they pertain to the possibility of a legality offense. But the one I want to start off with is relevant to the cross-reference application that Mr. Dasky was talking about. The court can affirm here because on this record, the record just does not support the argument being made that you can be simultaneously sane and insane for the same event. And further, it doesn't support that that's really a consideration that the guideline calculation process with specific defense characteristics and cross-references really apply. And we'll start off with that talking about the testimony that was given on that issue. Judge Wilson, I believe you were the one who asked about Dr. DeLand's testimony and whether she said it could be done. I disagree respectfully with counsel here. I don't think Dr. DeLand actually took it as far to say you can be legally sane and legally insane for different crimes that are committed simultaneously. And I think one of the things of what you pointed out in your question, Judge Wilson, is that I think Dr. DeLand separated the gun from the robbery. Now, our indictment puts everything in one day. The factual basis puts everything on one date, December 28, 2020. That was the date of the possession of the gun by a previously convicted felon. It's also when the robbery of the truck and the chase occurred. Does it say on or about? It does say on or about, but take a look at the factual basis, which was the substantial part of the plea and the PSR facts which were adopted. We're talking about things that happened beginning at around 2 or 3 a.m. on December 28, 2020, and went forward. And the reason that's important is because when Dr. DeLand's talking about the possibility of different things, she says she separates the gun crime, because he previously knew he couldn't possess the gun, from the New Orleans incidents, from the New Orleans robbery. Even though the way this is going, everything is combined. Everything happens simultaneously. Does this rest, the finding of sanity or insanity, does it rest on factual findings? It's going to be a legal conclusion based on, ultimately, it's a question of fact, I believe, because do the facts support? And that actually begs the question of what is the proper procedure? Normally, it's an affirmative defense in which the defendant would bear the burden of proof. And I think that's still the case here. I think that's how we were doing. So it is a factual finding based on the testimony and the evidence given. And one of those reasons are some of the facts that go into that are the facts, Judge Clement, that you pointed out in your question, what you have here, facts that show whether the defendant was actually, one, suffering from a mental disease or defect, such that, two, he could not appreciate the gravity of the rightful wrongfulness of his actions. So it is a question, ultimately, a factual question by a fact finder to make. What you have different here, though, and I think what Mr. Dosky was bringing up, too, with the example of jury instructions and inconsistent verdicts, the thing is, that's everything that happens before sentencing. That's something before guilt is imposed. And inconsistent jury verdicts are something that juries return. It's not something that defendants who have pled not guilty to every charge in the indictment seek from a jury, at least through their plea. Here, however, though, you have a guilty plea, which in that will waive reliance on an insanity defense. And now we go into the sentencing guideline calculation, looking at relevant conduct, looking at specific offense characteristics and cross-references. And on this, I agree with Mr. Dosky, the guidelines are ill-suited to really talk about whether the defense of legal insanity applies to a specific offense characteristic. Was this argument preserved with regard to the application of cross-reference? What's your position? We believe no, Judge, and we've argued that this is on plain error. I believe the argument below was much more focused toward a variance or a departure. And I have some examples. Page 365 of the record, I think the initial challenge to the cross-reference was because there was the absence of a formal charge, that the government had not charged robbery or carjacking. Page 264, this is what I believe you pointed out in the colloquy, that there was no new objection to the cross-reference made at sentencing. Instead, the argument would be waiting for the departure down below. Page 185, which was counsel's sentencing memo, I believe. In that memo, I believe there was an objection to the offense-level number, but the argument itself was about making that to show this is not one of the heartwarming cases to further support a departure or variance. If it's articulated there when we're arguing for a variance from the guideline sentence, is it preserved then for the cross-reference itself? I don't think so, Judge, because I think the whole point of plain error— If it's preserved for the variance or raised in the context of the variance, would it be preserved for a downward departure? Maybe I've got that reversed. We've treated the departure and variance as if that's simultaneous. Not that it's the same thing, but the argument was made for both, for the variance and departure. But a departure, by definition, is made after the calculations occur. It's made after the offense level is set, selected. It's made after relevant conduct is considered. It's made after the adjustments for specific offense characteristics under 2D— This would be 2K2, and then under 1B1.3, relevant conduct. It's after adjustments for 3C, obstruction. It's over in Chapter 5, after all that has occurred. The cross-reference has been applied. Yes. And all these other parts and pieces have been applied, and so we're looking at, here's your guidelines range. Yes. And so the argument that's being made at this point is, well, we should go below the guidelines range for— Are we talking about 3553A, or are we talking about— I mean, in other words, we're past the computation. I think once we get to 5K2.13, which is your departure provision for diminished capacity, we're past the guideline calculation. Now where are we going to move from that calculation? So the departure and the variance, I believe the sentencing memo did enough to preserve that. But in calculating the guideline to see whether the cross-reference five-level increase applied, I don't believe that was preserved. So we believe that is a plain error. And for that reason, because there really is no law on this subject of whether the not guilty by reason of insanity would even apply solely to a specific offense characteristic, I think under this Court's normal policy and normal precedent is that the absence of case law will not suffice to show clear and obvious error under the plain error rule. So for that reason, I think the Court should affirm— on that reason alone, I think the Court could affirm the calculation and the application of the cross-reference while still having—and still giving the benefit of a preserved review to the question of departure or variance. Does that answer your question? Is that my position on it, Judge? I think it does, yes. What you're saying is the challenge to the cross-reference is not preserved. That's our position. Is there enough in the record to say that it was affirmatively waived? In other words, I'm going to wait on that because I want to really argue this point in the variance. Is that over-reading the record? We didn't argue that, Your Honor. And I haven't seen enough to where I could fairly say that it was an intentional waiver of that. And I don't want to spring that on you or counsel here at oral arts. And I don't mean to spring it. I'm just trying to get the record in my head in terms of the way you're characterizing it. No, I understand. And I think the biggest reason—the other final reason we believe that was not preserved is page 269 of the record. The district court didn't take it as a—didn't take the sanity argument as an objection to the PSR cross-reference. It took it solely in the guise of looking at the departure or variance. So that's the other reason there. But beyond not being preserved and subject to affirmance for lack of clear, obvious error for lack of case law, there's good reason why the guidelines don't anticipate, why I think the Sentencing Commission probably didn't try to have the legal insanity defense with specific offense characteristics. One is that the Sentencing Commission appears— the only time in the guidelines it does seem to appear with mental health is in the diminished capacity departure guideline of 5.2K.13, which is actually broader than the legal insanity defense because it allows both consideration of cognitive and volitional impairment. And I think this court in Thames is the one we cited that said it seems to be the guideline-specific attempt to consider a mental condition, and that would be the departure provision. Also, an assertion of legal insanity at sentencing with reference to a specific offense characteristic really seems to be at odds with the whole idea of pleading guilty and presumably being sane about pleading guilty in the first place. That seems to create a mutually inconsistent thing. The guilty plea resolves the questions of that. Also, this is not directly on point, but I think it bears what we're saying. When we look at the 1.3A and it talks about what relevant conduct is, the commentary makes a point of saying we're looking for relevant conduct. We look at acts and omissions by a defendant. That's not necessarily the same thing as legal responsibility, such as a principle or compass. Now, that might not be in the same context, but it does show that the relevant conduct and the calculation of offense levels are something different than we would have at a trial level or a plea level for general criminal culpability. Another reason why this shouldn't work is there's really no procedure in place. We talk about what the legal insanity defense is, but if it applies to the calculations, as Mr. Dodsky suggests, what are the procedures? How does it? There's nothing in place. There's no statutory provision that says this happens in the guidelines. We do have the Insanity Defense Reform Act, 4241 through 4247, but that's specifically for the case of a trial. And 18 U.S.C. 4243 talks about what happens when a defendant has been found not guilty at trial by reason of insanity. A number of things are triggered there. One, that the defendant now has the burden to show that he will not be a danger to society if the underlying acquitted crime was a dangerous crime. Well, that's not in the guidelines, and he's not being convicted of a robbery crime. It's just a specific offense characteristic. So if you're not guilty by reason of insanity of a specific offense characteristic, this one being an armed robbery of a truck, which would seem to be violent, there's no other provisions of 4243 that kick in. There's nothing that says now we have to have a dangerous incident. There's nothing to talk about the protection of the public from someone who is dangerous, as there is if someone is actually found not guilty by reason of insanity under 4243. And because that's not there, and because it's not there, and because the statute doesn't apply to sentencing, if the court were to look at something for that, it would really be the court kind of taking something out of whole cloth and putting it there itself, which would raise a number of questions alone. If it did that, what would be the procedures? What would be the best way to protect the public? If a judge found someone not guilty of the specific armed robbery characteristic, but still found it dangerous, could he increase the sentence to account for that? We have a body of law already that frowns on expanding a sentence for someone needing treatment. I think those questions would come more and more. I think that's one other reason why the guideline cross-reference situation, calculation of defense level, does not contemplate having a defense of not guilty by reason of insanity to a specific offense characteristic. I think that's why it's limited to 5K2.13 with a diminished capacity departure and the possibility of a variance for 3553A reasons. That fits the general mode of sentencing. Look at the crime for which he was convicted, put the appropriate offense characteristics together, and then decide on departure and variances. So what's your explanation of what Judge Ash was saying? I think Judge Ash just took and said he did not... One, we have someone who is legally sane for the plea, and he did not take the position that the law would allow someone to simultaneously be legally insane for a crime committed at the same time. And maybe he branched out on that, but again, I come back to there's no law saying the otherwise. And I think if you look at the briefing from both Mr. Doskey and myself, I have not found any case on point that says to the contrary. I don't think Mr. Doskey has either, and I haven't seen it in the literature. And Dr. DeLand's testimony, I don't think, addressed that particular fact either. So again, without even the psychiatric evidence or case law, I can't say Judge Ash was completely wrong on that. I can't specifically say he's right because I don't have anything on that, but there's nothing to put there, which is why I don't think we meet the clear and obvious error test. But even aside from that, there's other reasons to affirm in this basis, assuming arguendo that the insanity defense would be in play or even assuming it's in play only for the departure of variance. The judge gave reasons for his sentence here, and his reasons show that he was focused on a few things. He was focused on the dangerousness aspect of these crimes. He was focused on the defendant's criminal history, which was 10 points and a Category 5, and the need to protect the public. And his reasons are at page 323 to 25 and 335 of the record of sentencing. He starts off, when is enough enough? He states there has to be a limit for what behavior can be accepted. He talks about the brandishing of a firearm to the cab operator, a violent act, and showing that there's a victim of that. He talks about driving this deceptive race truck through four parishes, over the causeway to I-12, out of St. Tammany Parish, through Tangibahoa Parish, into Livingston Parish, on a police chase. Disregarding the safety, he had to be stopped by finally throwing two sets of spike strips, which is the only thing that disabled the truck. And then the judge talks about the deleterious and really harmful behaviors here, and the need to protect the public. What that's showing is, regardless of what anything else was going on, the facts of this case, the judge was not necessarily going to look for his user's discretion for a variance. And those same reasons about dangerousness would have disqualified him for the departure under 5K2.13. Because that, although you can depart for a diminished capacity, that departure under 5K2.13 is prohibitive if facts and circumstances show the need to protect the public because of actual or a serious threat of violence, or the criminal history indicates a need to protect the public. So the departure was not going to be available anyway. And as you pointed out, the final thing I would say that helps affirmance are the facts of this case, Judge Clement, that show that Mr. Humbles may have been told by God to do these things, but he was still clearly understanding what he was doing was right from wrong. When he needed a ride back home, he took the truck, showing he actually had a motive for making the robbery. When God told him to take the truck, he hesitated. He felt awkward. He talked to God about what could happen, indicating he understood there was something wrong. When the truck operator entered the cab, he brandished a firearm, using the force of violence to take it. When the cab operator requested his things, he did give it, but as you pointed out, he apologized, showing remorse. When he took the truck, he didn't wait. He said, I'm going, and actually went through a gate to get it, showing that he didn't want to wait around to be caught. When he was driving the truck with the septic hose dragging, he expected there to be a police chase. He knew that other agencies had joined the chase, so he knew that police were following him, wanting to stop, yet he didn't, indicating he didn't want to be caught. And when he was being chased, he ignored the calls to pull over and dodge police spike strips several times until they finally were done. That shows that he did not want to be stopped. The facts of this case are not the case to reverse here and break some new law. On the facts here, there's just not enough to show that there was any error, plain or otherwise. And for that reason, on that we would ask that the court would affirm the cross-reference. There are other issues here on the obstruction and enhancement and also the prior DUI. Unless there are any specific questions from the court, we rely on our brief on that, and we would ask you to affirm. Thank you, Your Honor. I take it that even assuming arguendo counsel's iteration on a reassignment if we disagree? Yes, Your Honor, for the reasons we put in our brief, I don't see anything in here that Judge Asch did that would show some inflexibility. As opposing counsel noticed, there's, I believe he said, a paucity of case law on this. So if the court were to break new ground, I don't see anything that would tell me Judge Asch would not follow this court's instructions. So we would disagree with the need for reassignment. All right. Thank you. Thank you, Your Honor. All right. Back to you, Mr. Delkey. Very brief report, Your Honors. As a matter of fact, on pages 37 and 38 of the sentencing transcript, Dr. DeLand did address that she had come to different parts or different conclusions and why she came to those different conclusions. She did talk about that on page 37 and 38, and I just ask you to go ahead and refer to that. But what I've got to say beyond that is that pleading guilty doesn't resolve all questions. You know, when you look at the facts here, these facts are equally consistent with somebody who is insane as with somebody who is sane, perhaps. In fact, I think they're more consistent, once you understand Dr. DeLand's testimony, with somebody who is actually insane. So pleading guilty, when he is asked, are you pleading guilty to 922, and he is asked whether or not he agrees that the elements of the 922 have been satisfied, that's not inquiring of Mr. Humbles at all as to whether or not he knew that he was not acting on God's orders and that he was sane at the time that he took the truck. So it really doesn't resolve all questions. And when the judge started asking, or actually it was the prosecutor started asking, and I objected to whether or not Mr. Humbles would agree with the prosecution's summary of Dr. DeLand's testimony, the judge sustained the objection, but then he told me that he didn't really want to hear about anything at that point other than Mr. Humbles' competency to plead guilty to the 922. And Mr. Humbles was certainly confident to plead guilty to the 922. A couple of other points that were made while the prosecution was up here is I am astonished that we can say that there is no consideration of insanity in the guidelines in one breath. There's no contemplation of the use of insanity about relevant conduct or cross-references, and yet then complain that perhaps the defense didn't follow proper procedures. If in fact it's not contemplated by the guidelines, then how are you going to ever tell somebody they didn't follow proper procedures if there are no procedures in place? If there are no procedures in place, you can't follow those nonexistent procedures. And I think finally, we always come back, and I think the one case that the prosecution brought up, and I was happy they did bring it up once I started reading again, was United States v. Santiago, which mentions again that you have the mental component of the other crime that you've got to look to for cross-references. I'm glad that you asked that question, Judge Wilson, of the prosecution too. Is this a factual finding? Is this a law finding? Is this a mixed question of law and fact? Because I do think that's a very difficult question to answer when you're talking about insanity. And Santiago talks about it to the extent of saying you've got a mental component. Did my client intend to take the truck? Did my client intend to hold the gun up? Did my client intend to drive across the causeway? Oh, heck yeah. He intended to do every one of those things because God told him to do it. Did he intend to commit a crime? That's a totally different question. And so, because these questions are sometimes above our pay grade, we dump them in your laps. And we say, good luck with the judges. Thank you all. I appreciate it. All right. Thank you, counsel.